Scott S. Humphreys (SBN 298021)
humphreyss@ballardspahr.com
Susan N. Nikdel (SBN 317921)
nickdels@ballardspahr.com
**BALLARD SPAHR LLP**
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400
Facsimile: 424.204.4350

*Attorneys for Defendants*
*JAMES DALTON, an individual;*
*DAVID DERRICK, an individual;*
*JEFFREY PETERSON, an individual*

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, California 90067-2915

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PARTNERS FOR GROWTH IV, L.P., a Delaware limited partnership,

Plaintiff,

v.

JAMES DALTON, an individual;
DAVID DERRICK, an individual;
JEFFREY PETERSON, an individual;
and DOES I through 10, inclusive,

Defendants.

Case No. 3:21-cv-02807

**NOTICE OF REMOVAL OF CIVIL ACTION BY DEFENDANTS**

[Pursuant to 28 U.S.C. §§ 1332(a), 1441 and 1446]

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

**TO PLAINTIFF AND THE HONORABLE COURT:**

**PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446, Defendants James Dalton ("Dalton"), David Derrick ("Derrick"), and Jeffrey Peterson ("Peterson") (collectively, "Defendants"), hereby remove the above-captioned action entitled *Partners for Growth IV, L.P. v. Dalton, Derrick, Peterson, and Does 1 through 10*, Case No. CIV 2002913 (the "Action") from the Superior Court of California, County of Marin, to the United States District Court for the Northern District of California. By this filing, Defendants do not concede any allegations made by Plaintiff Partners for Growth IV, L.P. ("Plaintiff") or that Plaintiff is entitled to any relief whatsoever, and Defendants expressly reserve all rights to challenge Plaintiff's Complaint on all applicable grounds including for lack of personal jurisdiction and failure to state a claim. In support of removal, Defendants state as follows:

**PLAINTIFF'S CLAIMS**

1. Plaintiff originally filed the Action in the Superior Court of the State of California, County of Marin, on or about September 29, 2020. Plaintiff is a creditor of ActiveCare, Inc. ("ACAR"), a Delaware corporation in bankruptcy in the United States Bankruptcy Court for the District of Delaware. In the Complaint, Plaintiff asserts claims for (i) negligence; and (ii) negligent misrepresentation based upon (untrue) allegations that they were misled into extending a $1.5 million line of credit to ACAR in 2016. Specifically, Plaintiff alleges that certain contracts material to ACAR's financial projections were invalid and Defendants – former officers and/or directors of ACAR – negligently failed to apprise it of this fact. Both the negligence and negligent misrepresentation claims are based upon this same alleged omission. (Compl. ¶¶ 10-23). Plaintiff claims damages in excess of $2 million. (Compl. p. 13).

**GROUNDS FOR REMOVAL**

Removal to this Court is proper as all grounds for removal are satisfied.

1. Removal is timely. Plaintiff's Complaint was filed on or about September 29, 2020. However, Plaintiff took no steps to serve Defendants until Defendants' counsel agreed to accept service of the Complaint and did so on March 30, 2021, which was the first pleading received by Defendants setting forth the claims for relief upon which the Action is based. This

Notice of Removal has been filed within thirty days of receipt and service of the Complaint, and within one year after "commencement of the action" in state court and is therefore timely under 28 U.S.C. § 1446(b). Pursuant to 28 U.S.C. § 1446, a true and correct copy of all process, pleadings and orders in the Action and served upon Defendant is attached hereto as **Exhibit A**.

2. Diversity and Amount in Controversy Are Satisfied. Removal of this action is proper pursuant to 28 U.S.C. §§ 1441 and 1332 because there is complete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

a. Complete diversity exists pursuant to 28 U.S.C. § 1332(a)(1) because this action is between Citizens of different States. Defendants each are, and at all times relevant to the matters alleged in the Complaint were, residents of the State of Utah. Plaintiff, as alleged in the Complaint, is a Delaware limited partnership with its principal place of business in the County of Marin, State of California. (Compl. ¶ 1). Counsel for Defendants has consulted Plaintiff's counsel concerning the residences of any limited partners of Plaintiff and Plaintiff's counsel has not identified any non-diverse limited partners.

b. The amount in controversy exceeds $75,000.00. In the Complaint, Plaintiff states that it is seeking to recover "damages in such sum in excess of $2 million." (Compl. p. 13).

3. Jurisdiction is Proper. This Court would have had original subject matter jurisdiction of this action under the provisions of 28 U.S.C. § 1332 if the action had originally been brought in federal court. Removal to this District is proper because the Northern District of California includes Marin County, California, where the Action was originally filed in state court. *See* 28 U.S.C. § 84(a). Removal is, therefore, proper under 28 U.S.C. § 1441(a).

4. No Consent Needed. At the time of removal, no other Defendant has been named in this Action or entered an appearance in the Action.

5. Notice Is Being Effected. A copy of this Notice of Removal is being concurrently filed with the Superior Court of the State of California for the County of Marin (exclusive of exhibits) and concurrently served on Plaintiff. *See* 28 U.S.C. §§ 1446(a), (d).

/ / /

/ / /

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915
Telephone: 424.204.4400

**CONCLUSION**

For the foregoing reasons, Defendants hereby remove this Action, which is currently pending in the Superior Court of the State of California, County of Marin, to this Court.

DATED: April 19, 2021

Respectfully submitted,

BALLARD SPAHR LLP

BY: *__/s/ Scott S. Humphreys__*
Scott S. Humphreys
Susan N. Nikdel

ATTORNEYS FOR DEFENDANTS
JAMES DALTON, an individual;
DAVID DERRICK, an individual;
JEFFREY PETERSON, an individual

# EXHIBIT A

COPY
RECEIVED
MARIN COUNTY
SUPERIOR COURT

2020 SEP 29 AM 11:46

BY FAX

LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations
LEO D. PLOTKIN (SBN 101893)
Email: lplotkin@lsl-la.com
815 Moraga Drive
Los Angeles, California 90049-1633
Telephone: (310) 471-3000
Facsimile: (310) 471-7990

Attorneys for Plaintiff
Partners for Growth IV, L.P

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF MARIN

| | |
|---|---|
| PARTNERS FOR GROWTH IV, L.P., a Delaware limited partnership,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES DALTON, an individual; DAVID DERRICK, an individual; JEFFREY PETERSON, an individual; and DOES I through 10, inclusive,<br><br>Defendants. | Case No.<br><br>UNLIMITED CIVIL<br><br>**COMPLAINT FOR:**<br><br>**(1) NEGLIGENCE; AND**<br><br>**(2) NEGLIGENT MISREPRESENTATION** |

Plaintiff alleges:

1. Plaintiff Partners for Growth IV, L.P. ("PFG") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in the County of Marin, State of California. PFG is a private fund engaged in secured lending primarily across the technology and life sciences sectors.

2. PFG is informed and believes, and based thereon alleges, that defendant James Dalton ("Dalton") is now, and at all times material hereto has been, an individual residing in the State of Utah. Dalton formerly served as chairman of the board of directors and chief executive officer of non-party ActiveCare, Inc. ("ACAR"), and held such positions at the time of the loan

transaction between PFG and ACAR alleged below. PFG is further informed and believes, and based thereon alleges, that at all times material hereto, Dalton was the direct and/or beneficial owner of a substantial percentage of ACAR's stock.

3. PFG is informed and believes, and based thereon alleges, that defendant David Derrick ("Derrick") is now, and at all times material hereto has been, an individual residing in the State of Utah. Derrick formerly served as ACAR's chairman of the board of directors and chief executive officer, and at all times relevant hereto, was employed by ACAR as a consultant. PFG is further informed and believes, and based thereon alleges, that at all times material hereto, Derrick was the direct and/or beneficial owner of a substantial percentage of ACAR's stock.

4. PFG is informed and believes, and based thereon alleges, that defendant Jeffrey Peterson ("Peterson") is now, and at all times material hereto has been, an individual residing in the State of Utah. Peterson at various times served as a member, and later chairman, of ACAR's board of directors, and held the offices of chief financial officer, chief executive officer, and executive vice president of ACAR at different times. At all times relevant hereto, Peterson was the chief financial officer and a director of ACAR. PFG is further informed and believes, and based thereon alleges, that at all times material hereto, Peterson was the direct and/or beneficial owner of a substantial percentage of ACAR's stock.

5. PFG is presently unaware of the true names and capacities of defendants Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. PFG will amend this Complaint to state the true names and capacities of the fictitiously named defendants when ascertained.

6. PFG is informed and believes, and based thereon alleges, that each fictitiously named defendant has in some manner caused or committed the wrongful acts alleged in this Complaint, or is otherwise legally responsible for the damages sustained by PFG.

7. PFG is informed and believes, and based thereon alleges, that at all times material hereto, each defendant was the agent and/or employee of each of the remaining defendants, and in doing the acts and things herein alleged, acted within the course and scope of such agency and/or employment.

8. ACAR formerly engaged in the healthcare business as a provider of real-time online monitoring services for those with chronic diseases, primarily diabetes. Its platform allowed individual members of self-insured health plans to quickly perform diabetes-related blood tests with the ACAR device, and then upload the results to ACAR's software platform in real-time. Members and their doctors could then monitor online current and historical trends in the tests to manage the disease. ACAR's customers were the self-insured health plans that paid the healthcare costs of their members.

9. In or around October 2015, Mark Cooper ("Cooper") of RCC Ventures, LLC, a financial advisor to ACAR, contacted PFG to discuss potential financing on ACAR's behalf, on information and belief with the knowledge and consent and at the direction of Defendants. From the beginning of PFG's discussions with ACAR, Defendants and/or their authorized representatives touted a contract ACAR allegedly had recently signed with Trinity Health Corporation ("Trinity"), one of the country's largest health systems with over 300,000 diabetes patients, and emphasized that the contract was expected to generate substantial future revenue for ACAR. On October 22, 2015, Cooper, on information and belief with the knowledge and consent and at the direction of Defendants, emailed to PFG representative Jason Georgatos ("Georgatos") in California a signed copy of the alleged contract with Trinity, along with a PowerPoint presentation prepared by or at the direction of Defendants.

10. In the October 22, 2015 email, Cooper represented, on information and belief with the knowledge and consent and at the direction of Defendants, that ACAR had a signed contract with Trinity, which he attached to the email, and that "the first Trinity Health products are being shipped in November".

11. The PowerPoint presentation prepared by or at the direction of Defendants that Cooper attached to the October 22, 2015 email represented, among other things, that 2,652 Trinity patients were already in the "ActiveCare Pipeline", which constituted more than half of the 5,077 new patients that were "expected to close" in the "2015 Quarter" (which quarter was not specified but presumably was the December 2015 quarter) and in fact were "already shipping". The Trinity contract and the PowerPoint presentation were sent to convince PFG to

enter into negotiations with ACAR for financing of at least $3 million. PFG is informed and believes, and based thereon alleges, that at all times leading up to the parties' entry into the financing relationship alleged below, Defendants knew or should have known that no Trinity contract had come to fruition and was unlikely ever to do so.

12. PFG is informed and believes, and based thereon alleges, that the purported contract with Trinity resulted from the longstanding friendship between Derrick and Kevin Sears ("Sears"), who at the time was a vice president of Trinity. PFG is further informed and believes, and based thereon alleges, that after resigning as ACAR's chairman in April 2015, and at the urging of Dalton and Peterson, Derrick, as ACAR's purported consultant, contacted Sears to manufacture a large customer contract with Trinity under which ACAR could represent the resulting material expansion of its business to prospective lenders and investors.

13. PFG is informed and believes, and based thereon alleges, that by mid-2015, ACAR's entry into a purported agreement with Trinity that could be used to promote ACAR's prospects to potential lenders and investors became urgent, particularly for Derrick, Dalton and Peterson, ACAR's primary shareholders, because Derrick's friend, Sears, was seeking to leave his position at Trinity. PFG is further informed and believes, and based thereon alleges, that without Sears's involvement, no purported services agreement with Trinity – whether valid or invalid – could be devised for their use to raise money from prospective lenders and investors.

14. On November 11, 2015, after the PowerPoint presentation touting the Trinity contract and the Trinity contract itself had been sent to PFG, Derrick emailed a memorandum to Dalton, Peterson, and Brian Christian, at the time ACAR's controller, analyzing the effect on the company's cash flow if no revenues were received from Trinity and other sources that quarter. Derrick concluded in the email that "It definitely makes things much tighter but doable" and that ACAR "will need to have the term loan in place by January 1st or additional capital." Dalton, Peterson, and Derrick accordingly all were well aware of the importance of projecting substantial future revenues based on the contract with Trinity in order to obtain financing from PFG, and were well aware of the urgency of the matter.

15. On November 18, 2015, Derrick and Dalton, on information and belief with the knowledge and consent and at the direction of the other Defendants, met in Burlingame, California with Phil Lawson ("Lawson"), Georgatos, and Geoff Allan ("Allan") of PFG for an initial meeting to discuss potential financing from PFG. During the course of the meeting, Dalton and Derrick each repeatedly emphasized the importance of the contract with Trinity, which they said was a massive organization with over 300,000 patients with diabetes. Dalton and Derrick stated that the Trinity contract would significantly increase contracted recurring revenue, an element of gross revenues that is of substantial importance in a potential lender's analysis of a borrower's financial prospects and ability to repay a loan. Dalton and Derrick reiterated that the contract was already signed and that they were in the process of getting the end users onto the ACAR platform. Dalton emphasized that the contract was a game-changer for ACAR.

16. PFG was receptive to the overtures of ACAR's representatives concerning potential financing, and sought additional information concerning ACAR's business, including the new relationship with Trinity that had assumed great importance in ACAR's plans. On November 19, 2015, Derrick, on information and belief with the knowledge and consent and at the direction of the other Defendants, sent by email to Georgatos, Allan, and Lawson of PFG in California several significant documents to follow up the parties' meeting on the previous day. One such document was the purported contract with Trinity, dated July 30, 2015 and titled Provider Agreement between Plan Sponsor and ActiveCare, Inc. (the "Provider Agreement"). The Provider Agreement was signed by Dalton on ACAR's behalf and by Derrick's friend Sears on Trinity's behalf.

17. Another document sent to PFG with Derrick's November 19, 2015 email was titled Marketing and Sale Strategy (the "Narrative"). The Narrative described Trinity as "[o]ne of the cornerstones of ActiveCare's Strategy" with the potential to monitor more than 300,000 diabetics. The Narrative further stated that the first "deployments" on the Provider Agreement would occur in the December 2015 quarter, and that Trinity "has committed to rollout the ActiveCare product and service to at least 50,000 diabetics over the next 18 months . . . ." The Narrative included largely the same listing of clients with new members to be signed up as in the

PowerPoint presentation, except that it clarified that these new members would be added in the December 2015 quarter. The Narrative estimated a further 2,500 members from Trinity would be signed up in the June 2016 quarter, and another 5,000 members in the September 2016 quarter.

18. Also included with Derrick's November 19, 2015 email was a document titled Assumptions to Proforma (the "Assumptions"), which emphasized that the number of new members projected from Trinity substantially exceeded those from all other sources. From the December 2015 quarter through the December 2018 quarter, ACAR projected a total of 93,600 new members, of which 55,100 members, or just under 60%, were to come from Trinity.

19. The Assumptions related to a spreadsheet, on information and belief prepared by Peterson, that also was included in Derrick's November 19, 2015 email. The spreadsheet contained detailed projections of ACAR's financial performance through the December 2018 quarter based upon the assumed addition of the Trinity members stated in the Assumptions. Peterson projected that total revenues would steadily and substantially increase from the $1.5 million realized in the September 2015 quarter to over $19 million in the December 2018 quarter, with a concomitant increase in earnings before income tax, depreciation, and amortization ("EBITDA") from a negative ($627,056) in the September 2015 quarter to a positive $11,822,500 in the December 2018 quarter. The majority of the projected increases were attributable to Trinity members.

20. Defendants continued to supply materials to PFG during its due diligence process. On December 15, 2015, Derrick, on information and belief with the knowledge and consent and at the direction of the other Defendants, emailed to Georgatos and Allan of PFG in California a document titled The ActiveCare Strategy, which projected annualized revenue of $47 million, an increase of $40 million over ACAR's then-current $7 million of annualized revenues, and annualized income of $24 million, by the end of 2018. The ActiveCare Strategy document stated that the increased revenues and income would be realized primarily by "executing on [ACAR's] current contracts", including the "recently sign[ed]" contract with Trinity, which the document emphasized was the third largest hospital system in the United States managing the health of over 300,000 diabetics and ACAR's "most sophisticated" client. The alleged benefits of the

Provider Agreement were emphasized throughout the document, which stated that ACAR had the potential to monitor all 300,000 of Trinity's diabetes patients. No other ACAR customer was given the prominence accorded to Trinity, which accounted for more than 56% of the patients purportedly in the "ActiveCare Pipeline".

21. On December 21, 2015, Andrew Kahn ("Kahn"), Lawson, Georgatos, and Allan of PFG met with Derrick and Peterson, among others, at ACAR's offices in Orem, Utah for a due diligence meeting. During the course of the meeting, Derrick and Peterson confirmed that ACAR had an existing contract with Trinity pursuant to which ACAR would provide monitoring services to Trinity's members and that they expected the Trinity business to grow and provide substantial future revenue as stated in projections previously provided to PFG. Derrick and Peterson stated that rollout of the Provider Agreement had commenced, and that Trinity had committed to provide ACAR with 50,000 patients over 18 months. Also at the meeting, Derrick and Peterson gave the PFG representatives a hard copy of The ActiveCare Strategy that was emailed to PFG on December 15, 2015 as alleged above. Towards the end of the meeting, Dalton joined in via telephone from Hawaii, and reiterated the importance of the signed Trinity contract and that it would soon be coming online.

22. On December 23, 2015, Derrick, on information and belief with the knowledge and consent and at the direction of the other Defendants, sent an email to Kahn, Georgatos, Allan, and Lawson in California attaching "the projection with Trinity". Once again, the attached projections, which on information and belief were prepared by Peterson, showed that at least half, and often more than half, of the anticipated number of new members added each quarter would be from Trinity, resulting in steadily and significantly increasing revenues from $1.5 million in the December 2015 quarter to over $22 million by the quarter ended December 2018, almost $3 million more than estimated in the projections included in Derrick's November 19, 2015 email. In addition, EBITDA was projected at almost $14 million in the December 2018 quarter, approximately $2 million more than previously projected. The estimated number of new Trinity members to be signed up each quarter remained the same.

23. Based upon the information Defendants and/or their authorized representatives provided to PFG during the due diligence process, PFG decided to enter into a financing relationship with ACAR. Accordingly, on or about February 19, 2016, PFG and ACAR entered into a Loan and Security Agreement (as amended or supplemented from time to time, the "Loan Agreement") pursuant to which PFG made available to ACAR (a) a revolving line of credit not to exceed the lesser of $1,500,000 and 80% of ACAR's Eligible Accounts, as defined in the Loan Agreement, with the credit limit subject to specified increases upon achievement of certain financial milestones, and (b) a term loan of up to $3,000,000, of which $1,500,000 was disbursed upon execution of the Loan Agreement, with further disbursements available upon when ACAR satisfied specified performance criteria. The loans were secured by substantially all of ACAR's assets.

## FIRST CAUSE OF ACTION

### (Against All Defendants for Negligence)

24. PFG incorporates by this reference the allegations of paragraphs 1 through 23, inclusive, of the Complaint.

25. As officers, directors, significant shareholders, and/or authorized representatives of ACAR seeking to induce PFG to extend financing to ACAR and agreeing to provide information requested by PFG as part of the decision-making process, Defendants owed PFG a duty of care to provide PFG with accurate information concerning ACAR's business and projections based upon facts known to them at the time, to respond to PFG's requests for information with accurate information after due inquiry, and to ensure that the information provided to PFG was accurate and not materially misleading. Defendants knew that the information they would provide to PFG was important to PFG's decision whether to extend financing to ACAR.

26. Defendants breached the duty of care owed to PFG by, among other things, negligently (a) preparing, providing, authorizing, reviewing, and/or approving the projections transmitted to PFG that assumed the validity and enforceability of the Provider Agreement, (b) failing to confirm that Sears had the authority to bind Trinity to the contract with ACAR, and (c)

failing to inform PFG that ACAR had no ongoing relationship with Trinity and that the prospect of such a relationship ever coming to fruition was in substantial doubt.

27. Defendants' negligence in (a) relying on projected future revenues from Trinity given the lack of any existing business relationship between ACAR and Trinity, and (b) failing to confirm Sears's authority to bind Trinity to a contract with ACAR resulted in a materially misleading overstatement of projected increases in revenues and associated EBITDA estimates. PFG is informed and believes, and based thereon alleges, that each Defendant either knew that the projections contained in material provided to PFG were overstated and were not made in good faith, or, because they were strongly motivated to obtain financing for ACAR from PFG, negligently failed to supervise the preparation of the projections and otherwise failed to ensure that such projections were based upon facts at the time known to Defendants concerning the lack of a subsisting business relationship with Trinity and the substantial doubt that such a relationship would ever come to fruition.

28. PFG reasonably believed that the Provider Agreement represented a valid obligation of Trinity and that the projections based thereon were reasonably made, and reasonably relied on the existence of the Provider Agreement, the existence of an ongoing business relationship between ACAR and Trinity, and the projections Defendants authorized and/or provided to PFG when it entered into the Loan Agreement with ACAR and advanced millions of dollars thereunder. In addition to having no reason to disbelieve either Defendants' projections or the validity of the Provider Agreement, PFG reasonably assumed that because ACAR was at the time a public company subject to rigorous disclosure and reporting requirements under federal and state securities laws, the information Defendants provided was accurate. Had PFG known that the Provider Agreement was not binding on Trinity, or that Trinity would take the position that it was never bound by the contract, or that there had never been an ongoing business relationship between ACAR and Trinity, PFG would not have entered into the Loan Agreement.

29. PFG did not discover that Sears was not authorized to sign the Provider Agreement, and that Trinity never considered the Provider Agreement to be binding on it, until

May 2020, when counsel for ACAR's trustee in bankruptcy informed PFG's counsel of these facts. PFG could not, in the exercise of reasonable diligence, have earlier discovered Sears's lack of authority and the fact that Trinity never considered itself to be bound by the Provider Agreement as PFG had no reason to distrust Defendants' representations or believe that the Provider Agreement was anything other than what it appeared to be: a valid, enforceable contract binding on the parties thereto.

30. PFG first suffered damages resulting from Defendants' negligence in October 2018, when a substantial portion of ACAR's assets that served as collateral for PFG's loan was sold in ACAR's bankruptcy proceeding for an amount which, when combined with the limited value of the remaining assets, was far less than the amounts owed under the Loan Agreement, although PFG was unaware of such negligence until May 2020 as alleged above. PFG accordingly has suffered damages as a direct and proximate result of Defendants' negligence in the amount of all sums due and owing under the Loan Agreement, which includes principal, interest, attorneys' fees, and other charges and expenses. The precise amount of such damages will be established at the time of trial, but currently are estimated to exceed $2 million.

## SECOND CAUSE OF ACTION

### (Against all Defendants for Negligent Misrepresentation)

31. PFG incorporates by this reference the allegations of paragraphs 1 through 28, inclusive, of the Complaint.

32. Through the emails and in the meetings as alleged above, Defendants represented to PFG that the Provider Agreement was a valid and existing contract that supported their projections of ACAR's future revenues, which were based in large part on the number of Trinity members that they stated would be signed up to receive ACAR's monitoring services, and that the projections contained reasonable estimates of the anticipated results of ACAR's business operations for the periods presented (collectively, the "Representations"). PFG is informed and believes, and based thereon alleges, that all Defendants authorized and approved of the Representations.

33. PFG is informed and believes, and based thereon alleges, that at the time the Representations were made, such representations were not true because the Provider Agreement did not represent a valid contract binding on Trinity, and that Sears, a close friend of Derrick who signed the Provider Agreement purportedly on Trinity's behalf, was not authorized to do so, and had no authority to bind Trinity to the transactions contemplated therein, and Trinity had never committed any of its members to the ACAR program, much less the many thousands of members upon which the projections were based.

34. PFG is informed and believes, and based thereon alleges, that Defendants had no reasonable grounds for believing the Representations to be true and should have known that such representations were not true at the time they were made because Defendants then knew or should have known that no basis existed for the forecasted number of Trinity members, and the resulting revenue stream, as shown by, among other things, the following:

a. Derrick's close friend Sears knew that he was not in fact authorized to bind Trinity to the Provider Agreement, but signed the contract at the behest of Derrick, Dalton, and Peterson;

b. Defendants were aware that during the late summer and fall of 2015, after Sears and Dalton signed the Provider Agreement, members of ACAR's middle management met with Sears and certain other Trinity representatives to attempt to sell ACAR's services and reach an actual agreement, actions which demonstrated that Defendants should have known that Trinity was not yet on board with a potential business relationship with ACAR;

c. Derrick advised Dalton on or about September 21, 2015 that Trinity "was not sold" on moving forward with ACAR's services for Trinity's customers based upon what they "had been presented"; and

d. Although Dalton and Derrick should have known that no agreement with Trinity could be finalized without Sears' continued support, by September 21, 2015, Sears had already accepted a position with the Cleveland Clinic, another healthcare provider, and had agreed to submit his resignation to Trinity by October 5, 2015 and start at Cleveland Clinic by November 16, 2015, facts of which Dalton, Derrick and Peterson were aware, rendering it

extremely unlikely at the time Defendants made the Representations to PFG that anything would ever come of the Trinity relationship.

35. Defendants knew that PFG was depending upon the validity of the Provider Agreement and the estimates of future revenues attributable to Trinity members in deciding whether to enter into the Loan Agreement, intended that PFG rely upon the Provider Agreement and related projections in deciding whether to extend the financing to ACAR, and knew that PFG likely would be imperiled by making the loan to ACAR if Trinity was not bound by the Provider Agreement and that there was substantial uncertainty that the relationship with Trinity would ever come to fruition.

36. PFG acted in justifiable reliance on the truth of the Representations when it entered into the Loan Agreement and advanced ACAR millions of dollars thereunder. In addition to having no reason to disbelieve either the Representations or the validity of the Provider Agreement, PFG reasonably assumed that because ACAR was at the time a public company subject to rigorous disclosure and reporting requirements under federal and state securities laws, the information Defendants provided was accurate.

37. PFG did not discover that Sears was not authorized to sign the Provider Agreement, and that Trinity never considered the Provider Agreement to be binding on it, until May 2020, when counsel for ACAR's trustee in bankruptcy informed PFG's counsel of these facts. PFG could not, in the exercise of reasonable diligence, have earlier discovered Sears's lack of authority and the fact that Trinity never considered itself to be bound by the Provider Agreement as PFG had no reason to distrust Defendants' Representations or believe that the Provider Agreement was anything other than what it appeared to be: a valid, enforceable contract binding on the parties thereto.

38. As a direct and proximate result of PFG's belief that the Provider Agreement was a valid contract binding on and enforceable against Trinity, that there was an ongoing and subsisting business relationship between ACAR and Trinity, and that the estimate of future revenues attributable to the Provider Agreement was reasonable, PFG agreed to enter into the Loan Agreement with ACAR and advanced it millions of dollars. PFG first suffered damages

resulting from Defendants' negligent misrepresentations in October 2018, when a substantial portion of ACAR's assets that served as collateral for PFG's loan was sold in ACAR's bankruptcy proceeding for an amount which, when combined with the limited value of the remaining assets, was far less than the amounts owed under the Loan Agreement, although PFG was unaware of such negligent misrepresentations until May 2020 as alleged above. PFG accordingly has suffered damages as a direct and proximate result of Defendants' negligent misrepresentations in the amount of all sums due and owing under the Loan Agreement, which includes principal, interest, attorneys' fees, and other charges and expenses. The precise amount of such damages will be established at the time of trial, but currently are estimated to exceed $2 million.

WHEREFORE, plaintiff Partners for Growth IV, L.P. prays for judgment against defendants as follows:

1. On the first cause of action for negligence against defendants James Dalton, David Derrick, Jeffrey Peterson, and Does 1 through 10, inclusive, for damages in such sum in excess of $2 million as shall be proven at trial.

2. On the second cause of action for negligent misrepresentation against defendants James Dalton, David Derrick, Jeffrey Peterson, and Does 1 through 10, inclusive, for damages in such sum in excess of $2 million as shall be proven at trial.

3. On all causes of action:

   a. For prejudgment interest at the rate provided by law;

   b. For costs of suit incurred herein; and

   c. For such other and further relief as the Court may deem just and proper.

DATED: September 28, 2020

LEVY, SMALL & LALLAS
A Partnership Including Professional Corporations

By: [signature]
LEO D. PLOTKIN
Attorneys for Plaintiff
Partners for Growth IV, L.P

COPY

SUM-100

**SUMMONS**
***(CITACION JUDICIAL)***

**BY FAX**

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

FILED

SEP 29 2020

JAMES M. KIM, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: W. Simmons, Deputy

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

JAMES DALTON, an individual; DAVID DERRICK, an individual;
(see attached page for additional defendants)

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

PARTNERS FOR GROWTH IV, L.P., a Delaware limited partnership

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Marin County Superior Court
3501 Civic Center Drive
San Rafael, California 94903

CASE NUMBER: *(Número del Caso):* CIV 2002913

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Leo D. Plotkin, Levy, Small & Lallas, 815 Moraga Drive, Los Angeles, CA 90049 (310) 471-3000

DATE: *(Fecha)* SEP 29 2020 Clerk, by *(Secretario)* W. SIMMONS, Deputy *(Adjunto)*

JAMES M. KIM

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SEAL

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☐ by personal delivery on *(date)*:

POS-015

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 101893<br>NAME: Leo D. Plotkin<br>FIRM NAME: Levy, Small & Lallas<br>STREET ADDRESS: 815 Moraga Drive<br>CITY: Los Angeles STATE: CA ZIP CODE: 90049<br>TELEPHONE NO.: 310.471.3000 FAX NO.: 310.471.7990<br>E-MAIL ADDRESS: lplotkin@lsl-la.com<br>ATTORNEY FOR (*Name*): Plaintiff, PARTNERS FOR GROWTH IV, L.P. | *FOR COURT USE ONLY* |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** MARIN<br>STREET ADDRESS: 3501 Civic Center Drive<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: San Rafael, CA 94903<br>BRANCH NAME: Marin County Superior Court - Hall of Justice | |
| Plaintiff/Petitioner: PARTNERS FOR GROWTH IV, L.P., etc.<br>Defendant/Respondent: JAMES DALTON, an individual; et al. | |
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>CIV 2002913 |

TO *(insert name of party being served):* James Dalton, an individual, David Derrick, an individual, and Jeffrey Peterson, an individual

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: March 19, 2021

Leo D. Plotkin
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of ***(to be completed by sender before mailing):***

1. [x] A copy of the summons and of the complaint.
2. [x] Other *(specify):*

Notice of Case Management Conference (Civil); Blank Forms: Case Management Statement (CM-110), Notice of Settlement of Entire Case (CM-200). and Alternative Dispute Resolution (ADR) Informational Notice (CV006)

***(To be completed by recipient):***

Date this form is signed: March , 2021

Elizabeth A. Sloan
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

▶
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
Person authorized to accept service on behalf of Defendants James Dalton, an individual, David Derrick, an individual and Jeffrey Peterson, an individual

# MARIN COUNTY SUPERIOR COURT

P.O. Box 4988
San Rafael, CA 94913-4988

| | |
|---|---|
| PLAINTIFF: PARTNERS FOR GROWTH V<br>vs.<br>DEFENDANT: JAMES DALTON, ET AL. | CASE NO. CIV 2002913<br>**NOTICE OF CASE MANAGEMENT CONFERENCE (CIVIL)**<br>(Pursuant to Government Code Section 68600 et seq.) |

***Pursuant to Local Rule 1.3, the plaintiff must serve a copy of this Notice of Case Management Conference, a blank Case Management Statement (Judicial Council Form CM-110), a blank Notice of Settlement of Entire Case (Judicial Council Form CM-200), and an Alternative Dispute Resolution (ADR) Informational Notice (CV006) together with the complaint on all parties.***

This case is assigned for all purposes to Judge JAMES CHOU in Courtroom B.

1. The parties/counsel to this action shall comply with the filing and service deadlines in Local Rule 1.5 and California Rule of Court 3.110, or appear at the Order to Show Cause hearing on the dates set forth below:

   ~~Failure to File Proof of Service ____/____/____ 8:30 / 9:00 A.M.~~

   ~~Failure to Answer ____/____/____ 8:30 / 9:00 A.M.~~

2. Parties must appear for Case Management Conference on 04/12/2021 8:30 / 9:00 A.M.

3. The parties must be familiar with the case and be fully prepared to discuss the suitability of the case for binding or non-binding arbitration, mediation, or neutral case evaluation. **Counsel must discuss ADR options with their clients prior to attending the Case Management Conference** and should be prepared to discuss with the court their authority to participate in ADR.

4. Case Management Conference Statements must be filed with the court and served on all parties at least 15 calendar days before the Case Management Conference. **(Late filing may result in the issuance of sanctions.)**

*Distribution: Original - Court File; Canary - Plaintiff*

**MARIN COUNTY SUPERIOR COURT**
3501 Civic Center Drive
P.O. Box 4988
San Rafael, CA 94913-4988
(415) 444-7040

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATIONAL NOTICE

(California Rule of Court 3.221)

**The plaintiff <u>must</u> serve a copy of this notice with the complaint on all parties to this case.**

Alternative Dispute Resolution (ADR) is a way of solving legal disputes without going to trial. Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case.

### <u>ADVANTAGES OF ADR</u>

**Save Time**

A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money**

When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome**

In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships**

ADR can be a less adversarial way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction**

In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

## DISADVANTAGES OF ADR

If the case is resolved using ADR, the parties forgo their right to a public trial and they do not receive a decision by a judge or jury. If the case is not resolved using ADR and it proceeds to trial, the overall costs of the case may increase.

## TYPES OF ADR

### Mediation

In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

### Settlement Conferences

Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

### Arbitration

In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

### Neutral Evaluation

In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

## LOCAL ADR PROGRAMS

For a Directory of Mediators and Arbitrators or information about the Modest Means Mediation Program, contact the Marin County Bar Association (MCBA) by calling (415) 499-1314 or emailing *info@marinbar.org*. Additional information is also available on the MCBA website: *www.marinbar.org*.

## STIPULATION TO USE ADR

If all parties in the action agree to participate in ADR, a *Stipulation to Use Alternative Dispute Resolution Process (CV002)* may be filed with the court. This form is available at *www.marincourt.org* or in the Clerk's Office.

Please note, **you are required to complete and submit the *Notice of Settlement of Entire Case (Judicial Council Form CM-200)* within 10 days of the resolution of your case.**

Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, California 90067-2915

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is **BALLARD SPAHR LLP**, 2029 Century Park East, Suite 1400, Los Angeles, CA 90067-2915. On April 19, 2021, I served the within documents:

**NOTICE OF REMOVAL OF CIVIL ACTION BY DEFENDANTS**

☐ **BY HAND:** by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☑ **BY MAIL**: by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☑ **BY E-MAIL**: by attaching an electronic copy of the document(s) listed above to the e-mail address listed below.

Leo D. Plotkin
Levy, Small & Lallas
815 Moraga Drive
Los Angeles, CA 90049
Tel: (310) 471-3000
Fax: (310) 471-7990
Email: 1plotkin@ls1-1a.com

Attorney for Plaintiff
Partners for Growth IV, L.P

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 19, 2021, at Los Angeles, California.

______________________________
Shari L. Green